UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 3:10-CV-63 ) |
| BRENDA K. UNDERWOOD, | ) ) |
| Defendant. | ) ) |

MEMORANDUM OPINION

This civil action is before the court for consideration of "Plaintiff/Counter-Defendant/Third-Party Plaintiff American General Life Insurance Company's Motion for Summary Judgment" [doc. 38]. Defendant/Third-Party Plaintiff Brenda Underwood ("Underwood") has filed a response [docs. 44, 45], and American General Life Insurance Company ("American General") has submitted a reply [doc. 50]. Oral argument is unnecessary, and the motion is ripe for the court's determination.

American General has filed suit to rescind a life insurance policy pursuant to Tennessee Code Annotated § 56-7-103 or in the alternative for a declaratory judgment that insurance coverage under the policy never became effective. Underwood has filed a counterclaim for breach of contract or in the alternative for a declaratory judgment finding that insurance coverage was in existence at the time of the death of Underwood's husband, David Underwood ("Decedent"). American General seeks summary judgment on its claims against Underwood along with a denial and dismissal of Underwood's

counterclaim.[1]  For the reasons that follow, American General's motion for summary judgment will be granted on all grounds, including the dismissal of Underwood's counterclaim.

I.

*Background*

On September 8, 2008, Decedent executed Part A of an application for a term life insurance policy with American General.  Decedent executed Part B of the application on September 24, 2008.  Parts A and B are considered the "Application."  The policy is a twenty-year term policy with a death benefit of $300,000, with Underwood as the primary beneficiary.  The policy has a two-year contestability period.

> The application for the policy at issue contains the following language:
>
> I, the Proposed Insured signing below, agree that I have read the statements contained in this application and any attachments or they have been read to me.  They are true and complete to the best of my knowledge and belief.  I understand that this application: (1) will consist of Part A, Part B, and if applicable, related attachments including supplement(s) and addendum(s); and (2) shall be the basis for any policy and any rider(s) issued.  I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) such misrepresentation materially affects the acceptance of the risk; and (2) the policy is within its contestable period.
>
> Except as may be provided in any Limited Temporary Life Insurance Agreement, I understand and agree that even if I paid a premium no insurance will be in effect under this application or under any new policy or any rider(s) issued by the Company unless or until all three of the following

---

[1] American General has also filed a third-party complaint against the insurance agent involved in this case [doc. 20].  This complaint is not subject to the motion for summary judgment presently before the court.

2

conditions are met: (1) the policy has been delivered and accepted; and (2) the full first modal premium for the issued policy has been paid; and (3) there has been no change in the health of the Proposed Insured(s) that would change the answers to any questions in the application before items (1) and (2) in this paragraph have occurred. I understand and agree that if all three conditions above are not met (1) no insurance will begin in effect; and (2) the Company's liability will be limited to a refund of any premiums paid, regardless of whether loss occurs before premiums are refunded.
I understand and agree that no agent is authorized to: accept risks or pass upon insurability; make or modify contracts; or waive any of the Company's rights or requirements.

Part B of the application contains the following questions and answers provided by

Decedent:

5. Personal Health History . . .

B.   Is the Proposed Insured currently taking any medication, treatment or therapy or under medical observation?
*(If yes, provide details such as: date of first diagnosis; name, address, and phone number of doctor; tests performed; test results; medications or recommended treatment).*
[Decedent answered "yes" and provided "Methotrexate – see above" and "Mobic for arthritis"] . . .

F.   Other than previously stated, in the past 10 years, has the Proposed Insured:
1) been hospitalized, consulted a health care provider or had any illness, injury or surgery?
*(If yes, provide details such as: date of first diagnosis; name, address, and phone number of doctor; tests performed; test results; medications or recommended treatment).*
[Decedent answered "yes" and provided "Mercer (sic) staph infection – operation to correct 3 yrs ago. Dr. Schuman, 2001 Laurel Ave., Knoxville, TN 37916, (865) 673-0288   full recovery"] . . .

G.   Does the Proposed Insured have any symptoms or knowledge of any other condition that is NOT disclosed above?
*(If yes, provide details such as: date of first diagnosis; name, address, and phone number of doctor; tests performed; test results; medications or recommended treatment)*
[Decedent answered "No"].

3

The Policy provides: "The entire contract consists of this Policy, any riders and endorsements, the attached copy of the original application and any amendments or supplemental applications."

On January 19, 2009, Decedent saw Dr. Anthony Morton for complaints of posterior cervical discomfort, fever, and chills which he had been experiencing for a week. Dr. Morton prescribed Septra, Bactroban, and Hibiclens and told Decedent to return if not improved.

At delivery of the policy on January 24, 2009, Underwood executed a document titled Health Statement Policy Acceptance Acknowledgement American General Life Insurance Company by signing Decedent's name. The Health Statement provides in relevant part:

> I represent, on behalf of myself and any dependent that may have been proposed for insurance, that to the best of my knowledge and belief:
>
> 1. There have been no changes since the date of the application in either health or in any other condition which would affect insurability; and
>
> 2. Neither I nor any other proposed insured has, since the date of the application:
>
>    A. Consulted a doctor or other practitioner or received medical or surgical advice or treatment.
>    B. Acquired any knowledge or belief that any statements made in the application are now inaccurate or incomplete.
>
> I hereby represent that I have read, understand and verify the accuracy of the statements made above. I agree that this Acknowledgment will be made a part of the policy. I understand that if any statement above is not true, I should not sign this form. Instead, I should have the policy returned to the Company with full details for further underwriting consideration.

On January 26, 2009, Decedent again saw Dr. Morton who found on examination bilateral axillary lymphadenopathy masses and noted, "Findings are suspicious for development of lymphoma." He requested a referral to surgery for a biopsy. The following day Decedent went to the emergency room because of an altered mental status. A biopsy of Decedent's neck lymph nodes revealed he had a lymphoproliferative disorder. On October 4, 2009, Decedent died from angioimmunoblastic lymphoma and hemolytic anemia.

On November 9, 2009, Underwood submitted a claim for benefits under the policy. Because Decedent had died within the two-year contestability period, American General conducted a contestability investigation. During the course of the investigation, American General received the records from Dr. Morton showing that Decedent had seen him on January 19, 2009, and January 26, 2009. In a letter dated February 17, 2010, American General denied benefits under the policy. The denial was based on misrepresentation of pertinent information on the Health Statement. The letter also stated that American General was rescinding the policy, "making coverage null and void from the inception date." American General represented that it would make a full refund of the premiums paid plus interest.

II.

*Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56. Rule 56(a) sets forth the standard for governing summary judgment and provides in

5

pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(e)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

6

III.

*Analysis*

**Whether Coverage Ever Existed**

American General contends that no insurance ever took effect because the conditions precedent for the creation of coverage were not met. The Application provides that insurance does not exist unless there have been no changes in the proposed insured's health that would change the answers to any questions in the Application before delivery and acceptance of the policy and payment of the first premium. American General argues that there were changes to the health of the Decedent that would have changed the answers to questions 5(B), 5(F)(1), and 5(G) in the Application before delivery of the policy and payment of the premium; thus, no insurance came into effect. Five days prior to delivery of the policy, Decedent consulted a physician, had an illness, and was prescribed medications, facts which were not included in Part B of the Application.

Underwood contends that the change in Decedent's health was not a material change because he thought he was suffering from a cold or flu, not a serious condition. She cites *Edwards v. United States*, 140 F.2d 526 (6th Cir. 1944) in support of her contention that "[s]light troubles, temporary and light illnesses, infrequent and light attacks of sickness are not considered changes of good health, to disprove the warranty of good health." This authority does not advance Underwood's position. *Edwards* does not apply Tennessee law but relies on the World War Veterans Relief Act, 38 U.S.C. § 512 and other federal authorities. The case involves the question of voiding a policy for

7

fraud, and the provision at issue concerned whether the insured was in "good health," a different inquiry than in this case.

Further, Underwood's "materiality" requirement is not supported by the language in the Application or the Health Statement. The Health Statement directly asks whether since the date of the Application the proposed insured has "[c]onsulted a doctor or other practitioner or received medical or surgical advice or treatment." It does not qualify the inquiry by asking whether the consultation was for a minor illness or whether the proposed insured thought he was suffering from the flu, a cold or other less serious condition when he saw a doctor. The request is a blanket inquiry and is obviously seeking information about any doctor visit or treatment, regardless of the severity. The Health Statement is directly seeking to update information in the Application and specifically states that it will be a part of the policy.

Additionally, the Application straightforwardly sets out the requirements that must be met in order for insurance to come into effect. Thus, even if a premium has been paid, no coverage will begin until all three enumerated conditions are met: (1) the policy has been delivered and accepted; and (2) the full first modal premium for the issued policy has been paid; and (3) there has been *no change in the health of the Proposed Insured(s) that would change the answers to any questions in the application* before items (1) and (2) in this paragraph have occurred. The record reflects that a change in the health of the Decedent occurred prior to delivery of the policy and payment of the premium that changed the answers to three questions in the application. Decedent was experiencing symptoms that warranted seeing his physician who placed him on three medications. The

8

change in Decedent's health would have changed answers to certain questions in the application, specifically questions 5(B), 5(F)(1), and 5(G) would be different and occurred prior to delivery of the policy and premium payment. The conditions precedent that had to be met before the policy of insurance could come into effect were not met, and therefore no contract of insurance was formed. This fact defeats Underwood's contention that the contract was formed after an offer and acceptance. Furthermore, the Application makes clear that no agent had the authority to "accept risks or pass upon insurability, make or modify contracts, or waive any of the Company's rights or requirements." If the conditions precedent were not met as identified in the Application, no insurance would come into effect, which is what transpired in this case, and no agent had the authority to waive any policy requirements or American General's rights under the policy. Thus, the court concludes that insurance coverage did not come into effect.

### If Coverage Existed Whether American National Is Entitled to Rescission

American General also contends that even if coverage existed misrepresentations on the Health Statement increased its risk of loss so it is entitled to rescission of the policy, relying on Tennessee Code Annotated § 56-7-103. American General argues that there were misrepresentation in the Health Statement stemming from Decedent's changed health condition based upon Underwood's representations in that Statement. Underwood makes a series of arguments in response which will be discussed below.

9

Tenn. Code Ann. § 56-7-103 provides in pertinent part:

> No written or oral misrepresentation . . . in the application for contract or policy of insurance, by the insured or in the insured's behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless the misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

This provision "authorizes an insurance company to deny a claim for benefits in two circumstances – if the insured made intentional misrepresentations on the application for insurance or if the insured made misrepresentations that increased the insurer's risk of loss. . . . [D]etermining whether a particular misrepresentation increases an insurance company's risk of loss is a question of law for the court." *Smith v. Tenn. Farmers Life Reassurance Co.*, 210 S.W.3d 584, 589 (Tenn. Ct. App. 2006).

> The courts may use the questions an insurance company asks on its application to determine types of conditions or circumstances that the insurance company considers relevant to its risk of loss. Additionally, the courts frequently rely on the testimony of insurance company representatives to establish how truthful answers by the proposed insured would have affected the amount of the premium or the company's decision to issue the policy.

*Id.* at 590 (citations omitted); *Lane v. Amer. Gen. Life & Accident Ins. Co.*, 252 S.W.3d 289 (Tenn. Ct. App. 2007) (quoting and relying on *Smith*). "Misrepresentations, even if unintentional, may void an insurance policy if they increase the risk of loss to the insurer under the policy. . . . [C]ourts should evaluate whether the misrepresentation is of such importance that it naturally and reasonably influences the judgment of the insurer in making the contract." *United States Liab. Ins. Co. v. Scott*, No. 3:11-cv-01027, 2012 WL 5296317, at *5 (M.D. Tenn. Oct. 24, 2012) (internal quotation marks and citations omitted). It is not necessary to find that the insurance company would not have issued

the policy had the truth been disclosed, as "a showing that the insurer was denied information that it, in good faith, sought and deemed necessary to an honest appraisal of insurability is sufficient to establish the grounds for an increased risk of loss." *Smith*, 210 S.W.3d at 590.

As to whether Underwood made misrepresentations in the Health Statement, American General argues that she made four when she signed the Health Statement: that Decedent had not seen a doctor five days prior to delivery of the policy; that Decedent had not been experiencing symptoms of posterior cervical discomfort, fever, and chills for more than a week; that Decedent had not received medical treatment since the date of application and had not been prescribed the medications Septra, Bactroban, and Hibiclens; and that Decedent had not acquired knowledge that three of the statements made in the Application were incomplete or inaccurate at the time of executing the Health Statement.

Underwood argues that there are issues of fact regarding whether the answers were true or false and that a jury question exists. The court disagrees. At the time of her deposition, Underwood admitted that she knew Decedent had seen a doctor prior to her executing the Health Statement on January 24, 2009, and she admitted that the answers to questions 5(B) and 5(F) on the Application were untrue because of Decedent having been treated by Dr. Morton on January 19, 2009, and having been prescribed three medications. In light of these admissions on the record, reasonable minds could not differ as to whether misrepresentations were made when the Health Statement updating the Application was executed.

11

With regard to whether the misrepresentations increased the risk of loss, American General has submitted in support of its position the declaration of Nancy Yasso, the Director of Underwriting Services for American General. Yasso testifies that if American General had known about Decedent's visit to Dr. Morton on January 19, 2009, the underwriting department would have delayed issuing the policy and an attending physician statement would have been requested. Yasso also states that the Health Statement rendered the answers to questions 5(B), 5(F)(1), or 5(G) in the Application false, and the false answers increased American General's risk of loss. She further testifies, "[American General's] risk of loss was increased by the falsity of the Health Statement and the consequent rendering of the answers to questions 5([B]), 5([F])(1), or 5([G]) in the Application as false because they naturally and reasonably influenced the judgment of [American General] in making the contract." Additionally, Yasso states that "[i]f [American General] had known that the answers to Questions 5([B]), 5([F])(1), or 5([G]) in the Application were false as of January 24, 2009, the Policy would not have been issued as applied for until such time as a review of those answers was completed."

While Underwood acknowledges that whether American General experienced an increased risk of loss is a question of law for the court, she argues that the court does not have to consider the testimony from American General employees concerning whether the misrepresentations increased its risk of loss, relying on *Tennessee Farmers Mutual Insurance Company v. Ball*, No. 03A01-9504-CH-00124, 1995 WL 699981 (Tenn. Ct. App. Nov. 29, 1995). However, the finding in *Ball* that the court did not have to consider the testimony of insurance company employees regarding the increased risk of loss was

12

based on Tennessee summary judgment procedure that is inapplicable here. Tennessee courts and courts applying Tennessee law do consider the testimony of insurance company employees regarding the issue of increased risk of loss. *Smith*, 210 S.W. 3d 584; *Lane*, 252 S.W.3d at 296 (citing *Smith*); *Snead v. Nationwide Prop. & Cas. Ins. Co.*, 653 F. Supp. 2d 823, 826-28 (W.D. Tenn. 2009) (citing *Smith* and *Lane*); *Scott*, 2012 WL 5296317 (court considered affidavit testimony of underwriter in determining that misrepresentations in application increased risk of loss). The court has considered the declaration testimony of Yasso, testimony that has not been countered by Underwood, and concludes that the misrepresentations increased American General's risk of loss.

Underwood also contends that it is her position that the Decedent did not sign the Health Statement, so the policy should not be voided or coverage denied and cites authority for the proposition that if a policy is completed and signed without authority, misrepresentations will not void the policy. Underwood, however, makes no affirmative statement that she did not have the authority to sign the Decedent's name on the Health Statement and other papers on January 24, 2009, merely that the Decedent did not sign it. Jack Barker, the person who delivered the policy papers, testified that he told Underwood to "Read this" and that Underwood "said she could sign for it." Further, the fact that Underwood testified in her deposition that she could not remember whether she read the Health Statement and that she thought she was just signing to accept the policy does not change the analysis. Underwood had an obligation to read what she was signing. Her contention that the question concerning the consultation with a doctor referred to the Decedent's arthritis is not supportable. Underwood knew her husband had seen Dr.

13

Morton and had been prescribed three medications when she signed the Health Statement, which cannot be interpreted to mean it was inquiring about Decedent's existing arthritic condition.

In Tennessee, it is well settled that "[t]he law presumes that persons who sign documents, having been given the opportunity to read them, are bound by their signatures." *Baker v. Johnson*, No. M2007-01992-COA-R3-CV, 2009 WL 167204, at *5 (Tenn. Ct. App. Jan. 23, 2009); *Solomon v. First American Nat'l Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989) ("Ordinarily, one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it."). The Health Statement clearly and directly sets forth the information the signee is verifying as accurate, which involves the time since the date of the application.

Underwood goes on to argue that "if the health statement was a part of the original application as argued by [American General], any representations made by Mr. Underwood or Mrs. Underwood, would be made to the best of their knowledge and belief." The cases she cites in support of this argument are from other states and are not helpful in applying Tennessee law. However, as American General points out, even if it allowed Underwood to sign the Health Statement, which it denies, she could still bind the Decedent by providing information to the best of her knowledge or belief. *Ginn v. American Heritage Life Ins. Co.*, 173 S.W.3d 433 (Tenn. Ct. App. 2004).

In *Ginn*, the insurance company made the determination to allow the plaintiff to furnish the medical history of her spouse for the insurance application and to sign his

14

name on the application. The Court of Appeals determined that what was relevant to the issue of misrepresentation was the plaintiff's knowledge concerning her husband's health not what knowledge the husband had concerning his own health. *Id*. at 441. At the time she signed the Decedent's name on the Health Statement, Underwood knew that he had seen a doctor recently and had been prescribed medication. Thus, to the best of her knowledge and belief, she had that information concerning her husband's health, information that was directly addressed in the Health Statement and relevant to the application and coverage. The Health Statement also provides, "I understand that if any statement above is not true, I should not sign this form. Instead, I should have the policy returned to the Company with full details for further underwriting consideration."

Whether Underwood read the Health Statement or not, she is charged with knowledge of its contents. *Solomon*, 774 S.W.2d at 943. In signing the Health Statement on her husband's behalf, Underwood represented that since the date of the application there had been no change in the health or condition of her husband and that her husband had not "[c]onsulted a doctor or other practitioner or received medical or surgical advice or treatment." She also represented that since the date of the application no knowledge or belief had been acquired such that "any statements made in the application are now inaccurate or incomplete." Underwood admitted in her deposition that she knew her husband had seen a doctor recently and that he was taking medication as a result.

The language in the Health Statement is clear, direct and straightforward. It is more than just a receipt; it is also a verification regarding information given in the application and whether circumstances have changed since the date of the application,

15

like whether the proposed insured had consulted a doctor and was receiving medical treatment. This is certainly information that American General considered important and that would influence its judgment in making an insurance contract, since it was seeking verification of whether information in the application remained current. The inquiry under § 56-7-103 "is whether the misrepresentations increased the risk of loss generally, such that an insurer having the benefit of truthful information would have charged a higher premium to protect itself against an increased risk of loss, or otherwise deemed the risk altogether unacceptable." *Scott*, 2012 WL 5296317, at *7. The court concludes that the misrepresentations in the Health Statement that were directly related and integral to the application were such that they were likely to influence the judgment of the insurer in forming the contract.

Underwood further argues that American General should be estopped from denying coverage because she and the Decedent detrimentally relied on American General that they had a valid insurance contract and as a result they cancelled another policy. Thus, Underwood contends American General should be equitably estopped from denying coverage. However, under Tennessee law, one of the essential elements that a party claiming estoppel must show is the "[l]ack of knowledge and of the means of knowledge of the truth as to the facts in question." *Harvey v. Farmers Ins. Exch.*, 286 S.W.3d 298, 304 (Tenn. Ct. App. 2008) (quoting *Callahan v. Town of Middleton*, 292 S.W.2d 501, 508 (Tenn. Ct. App. 1954)). With regard to insurance contracts, "the insured is *conclusively presumed* to have knowledge of, and to have assented to, all the terms, conditions, limitations, provisions or recitals in the policy, irrespective of whether

16

the insured actually read, or could read, the insurance contract." *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 274 (Tenn. 2001) (internal quotation marks and citation omitted) (emphasis in original). Thus, Tennessee law presumes that the Decedent had knowledge of all the terms and conditions of the insurance policy, including the conditions precedent that had to be satisfied before coverage would begin. As discussed above, those conditions precedent were not met. The Decedent had the responsibility to maintain other insurance coverage he may have had until he had knowledge that valid coverage existed under the American General policy. This estoppel argument fails.

Underwood also argues that "[i]n an action on a contract of insurance, the insurance company is generally considered estopped to deny liability on any matter arising out of fraud, mistake or negligence of the agent of the company." However, in this case, there are no contentions nor in there any showing of fraud, mistake or negligence on the part of the agent. As referenced above, the Application signed by the Decedent provides, "I understand and agree that no agent is authorized to accept risks or pass upon Insurability, make or modify contracts, or waive any of the Company's rights or requirements." Any claim by Underwood that the agents waived the required conditions precedent fails.

Underwood further contends that American General cannot rely on any misrepresentations in the Health Statement because the policy delivered to the Underwoods did not contain the two statements that were signed by Underwood, "misrepresenting Mr. Underwood's health and being amendments to his application."

17

The Health Statement was delivered with the Policy. The Health Statement plainly seeks to update the information provided in the application; thus it is supplementing the application. Also, the Health Statement provides that the proposed insured "agree[s] that this Acknowledgement will be made a part of the policy," and the policy provides that the insurance contract includes the application. This argument by Underwood also fails.

IV.

*Conclusion*

Accordingly, for the reasons discussed herein, American General's motion for summary judgment will be granted on all grounds, including the dismissal of Underwood's counterclaim. American General's only obligation to Underwood is the return of the premiums paid, the amount of which has been on deposit with the Clerk. Underwood shall be paid the amount on deposit plus interest to the date of entry of the court's opinion and order. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge